**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISON**

| | | |
|---|---|---|
| GROVER EDWIN SIMPSON, IV, | ) | CASE NO. 1:20-CV-02767-JG |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES GWIN |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | CARMEN E. HENDERSON |
| | ) | |
| Defendant, | ) | **REPORT AND RECOMMNEDATION** |
| | ) | |


## I.    Introduction

Plaintiff, Grover Simpson ("Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Supplemental Security Income ("SSI"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

## II.    Procedural History

On January 29, 2019, Claimant filed an application for SSI, alleging a disability onset date of August 16, 2018. (ECF No. 11, PageID #: 152). The application was denied initially and upon reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ"). (ECF No. 11, PageID #: 202). On April 2, 2020, an ALJ held a telephonic hearing,[1] during which

---

[1]    The hearing was held via telephone due to the COVID-19 pandemic. 20 C.F.R. 416.1436(c)(2).

Claimant—represented by counsel—Claimant's mother, and an impartial vocational expert testified. (ECF No. 11, PageID #: 117). On April 21, 2020, the ALJ issued a written decision finding Claimant was not disabled. (ECF No. 11, PageID #: 87). The ALJ's decision became final on October 15, 2020, when the Appeals Council declined further review. (ECF No. 11, PageID #: 69).

On December 16, 2020, Claimant filed his Complaint to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 12, 15, 16). Claimant asserts the following assignments of error:

> (1) Psychological opinion evidence does not support the decision of the administrative law judge
>
> (2) Other evidence, namely records from Opportunities for Ohioans with Disabilities (Bureau of Vocational Rehabilitation), does not support the administrative law judge's decision.

(ECF No. 12, PageID #: 839, 843).

## III.    Background[2]

### A.    Relevant Hearing Testimony

### 1.    Claimant's Testimony

The ALJ summarized the relevant testimony from Claimant's hearing:

> The claimant testified he is 19 years old and lives with his mom, stepdad, and older sister. The claimant indicated he was about to graduate in a month or two, and he indicated plans to attend MercyHurst in Pennsylvania after graduation, where he will be in a special program. The claimant reported difficulty being a member of society. . . . The claimant testified to use of antidepressant medication, but nothing to treat autism. . . . The claimant testified to difficulty being around other people, and he reported saying things that come out the wrong way. The claimant stated he apologizes

---

[2]    Claimant's appeal focuses on the ALJ's RFC assessment regarding his mental impairments. (ECF No. 11, PageID #: 824). As such, the Court does not discuss Claimant's physical impairments.

afterwards, and he denied physical altercations with others. The claimant said he has undergone counseling, treatment to improve his motor skills, and some vocational training, where he did stocking work and helped sweep an animal facility. The claimant testified he has always had issues asking for help if he forgets to do something. The claimant indicated he is doing well in school, where he continues to get speech therapy and extra time for testing. The claimant testified he does not drive, as he only drove once with his uncle in an empty parking lot. The claimant said his mother helps fill out job applications. The claimant denied participation in clubs or social activities, and said when he is home, he is usually in his room.

(ECF No. 11, PageID #: 97).

### 2.    Claimant's Mother's Testimony

The ALJ also summarized Claimant's mother's relevant hearing testimony:

The claimant's mother, Amanda Simpson, testified the claimant engages in no social activities. She reported inappropriate behavior and responses, as the claimant cried and could not be redirected when his fish died. Ms. Simpson said the claimant was looking into how to euthanize a fish. She stated the claimant will get upset if they refer to it as just a fish. Ms. Simpson testified the claimant does not like crowds, as it is a trigger. She confirmed the claimant drove only once, as he was overwhelmed. Ms. Simpson testified to poor emotional responses, and said when the claimant is anxious, he will rock back and forth and does not know what to say or do. Ms. Simpson testified the claimant cannot handle money. She said the claimant can load the dishwasher and do his laundry. Ms. Simpson stated she has been working with the claimant on how to cook before he leaves for school, and she said that learning for him is a process. She testified they recently cooked pasta, and she had to have the claimant read the instructions many times. Ms. Simpson indicated use of a job coach at a prior job, where the claimant had no contact with customers.

(ECF No. 11, PageID #: 97).

### 3.    Vocational Expert's Testimony

The ALJ asked the vocational expert to assume a person of Claimant's age, education, and work experience who was limited in the manner ultimately found in his decision and determine

whether there were any jobs the hypothetical person could perform. (ECF No. 11, PageID #: 140). The vocational expert cited three unskilled, light jobs the person could perform. (ECF No. 11, PageID #: 140). However, if that person were off task 20% of the time, needed a job coach consistently during the job, or needed training time longer than 30 days, there would be no jobs for the person to perform. (ECF No. 11, PageID #: 141–42).

## B. Relevant Medical Evidence

The ALJ also summarized Claimant's health records and symptoms:

> In April 2009, the claimant underwent special education reevaluation while attending Amherst schools (Exhibit 7F/2-3; 8F; 9F). The claimant had received special education services by way of an individualized education plan (IEP) since preschool for mild autism spectrum disorder (Id.). The claimant had made great progress in language skills, resulting in current language abilities in the average range, though he continued to demonstrate below average social skills (Id.). The claimant experienced difficulty with coping skills, especially when things become difficult, or when dealing with change or conflict (Id.). He was also very literal, and had difficulty understanding humor and sarcasm (Id.). It was noted the claimant would benefit from social skills group (Id.). Testing confirmed normal cognitive functioning, as a Wechsler Intelligence Scale for Children, Fourth Edition (WISC-IV), revealed a full scale IQ of 100 (Exhibit 8F/11; 7F/2). The evaluation team report (ETR) noted that while improvements had been made, the claimant continued to have some ongoing difficulty with inappropriate behavior and social/language pragmatic skills in the classroom that have a negative impact on his daily academic performance (Id.). The claimant could be rigid in his thinking and behavioral patterns, hyperverbal, and had increased anxiety and negative emotionality (Id.). It was determined that in addition to intervention through speech/language services, additional special education services should be considered in a least restrictive setting in order to provide behavioral support, accommodations, and academic assistance (Id.). In addition to regular classes, the claimant would need academic and behavioral support from the small group instruction tutor and speech/language therapist who could also provide consultation to his regular education teacher (Id.).
>
> An ETR dated May 2012, when the claimant was in the fourth grade, noted tremendous gains (Exhibit 7F/14-41). The claimant was

pleasant and cooperative during evaluation, and quickly established rapport with the examiner (Id.). A WISC-IV administered in April 2012 revealed a verbal comprehension index of 121 and perceptional reasoning index of 121, both in the 92nd percentile, and superior range, and working memory index of 88 and processing speed index of 88, both in the 21st percentile, and low average range (Exhibit 7F/19). Due to the discrepancy between the scores, a general ability index (GAI), as opposed to a full scale IQ score, was utilized (Id.). The claimant was assigned a GAI of 124, which was in the 95th percentile, and superior range (Id.). The claimant was doing well academically, as he was functioning at or above grade level expectations in all core subject areas at that time, and his social/emotional functioning at school was reported to be typical for a child his age (Exhibit 7F/14-41). A parent form indicated significant autism spectrum disorder related symptoms in the elevated range; however, teacher reports indicate he did not display a significant amount of autism spectrum disorder related symptoms in the school setting (Exhibit 7F/24-25). It was noted the claimant had made significant progress both academically and behaviorally since the initiation of special education services, and he continued to make consistent growth in these areas with limited special education support (Exhibit 7F/14-41). It was determined the claimant would receive regular education services in the general classroom setting with accommodations, including extended time and breaks when needed, to help with anxiety-provoking situations (Id.).

In September 2015, the claimant's mother agreed to implementation of a 504 plan (Exhibit 7F/47).

In October 2016, the claimant underwent special education assessment/evaluation in light of parental concerns for social/emotional functioning, motor skills, and communications deficits (Exhibit 13E/4-38; 6F). The claimant was in the 9th grade at the time, and currently receiving accommodations through a 504 plan (Id.). However, the claimant's parents felt that current services were not helping enough (Id.). It was noted the claimant had received special education services beginning in preschool for autism spectrum disorder with delays in communication, cognition, and adaptive behavior, which included speech and language therapy, and monitoring of motor skills (Id.). Special education services were discontinued in the fourth grade due to improved skills, resulted in goals being met (Id.). However, the claimant's parents indicated concern about his progress, so an accommodation plan was developed (Id.). During the 2015-2016 school year, the claimant received mild accommodations by way of a 504 plan, which

included modifying the environment (use of proximity seating, seating of student in area free from distractions, opportunities for movement, breaks as necessary, and quiet area available in morning and after school as needed), modifying for time demands (extra time to complete assignments, tests, and homework), and adaptations for testing and grading (extra time and breaks) (Exhibit 13E/4). Cognitive testing conducted in September 2016 was unremarkable, as a WISC-IV revealed a full scale IQ of 109, and a WIAT-III test yielded an average reading scaled score of 112, in the 79th percentile, math scaled score of 114, in the 82nd percentile, and written language scaled score of 114, in the 82nd percentile (Exhibit 13E/2, 12-13, 25). Reports and observations indicated the claimant is very smart, does well in class, and participates appropriately (Exhibit 13E/10-11). The claimant sometimes rambled on, or made inappropriate comments, but he was easily redirected, and he was consistently friendly, engaging, and polite (Id.). It was determined the claimant would continue to receive mild special education supports with accommodations in all subjects, including extra test time, and extended time and breaks for testing (Exhibit 13E/36). It was also noted that continued consultation with school counselor or school psychologist should be encouraged to help the claimant identify goals and values for future, as well as improve self-understanding of complex social issues and methods to cope with frustration, disappointment, and anger (Id.).

On July 6, 2017, the claimant complained to primary care provider Dr. Kacir of increased anxiety after witnessing his father assault his sister; however, the claimant denied suicidal or homicidal ideation (Exhibit 19F/22-24). Examination revealed normal mental status findings, as the claimant was alert and oriented, with appropriate mood/affect, no irritability or lethargy, normal speech/language and thoughts, intact ability to perform basic computations and apply abstract reasoning, intact associations, no psychosis, intact memory, normal attention and concentration, and appropriate insight and judgment (Id.). Dr. Kacir diagnosed the claimant with anxiety disorder, currently not well controlled, and prescribed an increased Celexa dosage (Id.). Dr. Kacir referred the claimant to psychiatry, given that he now required Celexa at a greater than recommended dosage (Id.).

From May 2017 to August 2019, the claimant underwent counseling with Kenna Mycek, LISW, who diagnosed the claimant with autism spectrum disorder, generalized anxiety disorder, depressive disorder unspecified, and major depressive disorder (Exhibit 5F, 15F). The claimant reported autism spectrum disorder, anxiety, and depression, resulting in difficulty engaging with peers, troubled

family relationships, and a desire to isolate (Id.). The claimant presented as mildly to moderately anxious, with occasionally pressured speech; however, examinations revealed no overt signs or symptoms of anxiety, and the claimant presented as bright and verbal (Id.). In March 2019, the claimant appeared very depressed and he talked about vague suicidal ideation; however, he had admittedly stopped all medications (Exhibit 15F/11). In July 2019, after restarting medications, the claimant indicated his anxiety was manageable, and Ms. Mycek noted no overt signs or symptoms of depression (Exhibit 15F/8). By March 15, 2019, the claimant appeared to have stabilized substantially, and he reported compliance with the current treatment plan (Exhibit 15F/10). From May to August 2019, Ms. Mycek noted the claimant continued to be stable (Exhibit 15F/8-9).

The record contains evidence of medication management with Michael D. Hottois, M.D., of the Nord Center, from January 2018 to June 2019 (Exhibit 12F, 16F). Treatment notes contain reports of increased depression and irritability in March 2019 following the death of the claimant's grandmother; however, the claimant reported doing well otherwise (Id.). In fact, treatment notes contain reports of an otherwise good mood, with no anxiety, depression, anger, or irritability, good sleep and appetite, and intact concentration at school (Id.). The claimant also consistently denied medication side effects (Id.). Treatment notes indicate possible noncompliance, as the claimant reported compliance with medication, but records from July 2018 indicate not enough refills (Exhibit 12F/17). Mental status examinations revealed a disheveled appearance at times, a constricted, blunted, and/or flat affect, and decreased insight/judgment (Exhibit 12F, 16F), and examination in March 2019 revealed additional abnormalities, including a depressed, irritable mood, dull affect, and poor insight/judgment (Exhibit 12F/29-30; 16F/21-22). However, examinations revealed an otherwise euthymic mood, normal alertness, good grooming at times, expressive language, clear speech, normal thoughts, intact associations, and good fund of knowledge (Exhibit 12F, 16F). Dr. Hottois diagnosed the claimant with persistent chronic adjustment disorder with anxiety, and prescribed Celexa 30 mg (Id.).

On May 31, 2018, the Opportunities for Ohioans with Disabilities determined the claimant was eligible for vocational rehabilitation services based on a determination that he was significantly disabled (Exhibit 18F/4-14). The claimant was attending Marian L. Steel High School at the time, and receiving special education services by way of a 504 plan for deficiencies in social skills and adaptive behaviors (Id.). The claimant was currently receiving consultation

with a school counselor or psychologist to improve self-understanding of complex social issues and methods to cope with frustration, disappointment, and anger (Id.). Cognitive testing by way of a WISC-V had shown weak performance in working memory tasks, which measures concentration and mental control, and as a result, the claimant received extra time and breaks with testing (Id.).

During July and August 2018, the claimant engaged in work activity by way of receipt of vocational rehabilitation services, which included tasks such as stocking and cleaning (Exhibit 14E; 18F/15-30). The claimant was able to perform tasks correctly/to expectation after prompting and redirection to stay on task (Id.).

Education records form April 2019 indicate placement in the regular classroom setting (Exhibit 13E/2).

On May 9, 2019, the claimant underwent consultative examination with psychologist James N. Spindler, MS, at which time the claimant reported applying for disability due to Addison's disease (Exhibit 1F). The claimant admitted sleep problems, but specifically denied depression or anxiety if on medications (Id.). The claimant was in the 11th grade, receiving some special accommodations, and doing well academically, with a GPA of 3.5 (Id.). The claimant indicated he has a few friends, and he reported getting along well with students and teachers, though he was not involved in extracurricular activities or social organizations (Id.). The claimant indicated good school attendance (Id.). The claimant did not have a driver's license or legal history (Id.). The claimant indicated he was currently seeing a counselor for depression and anxiety, but had never been hospitalized (Id.). The claimant had never had competitive employment; however, he reportedly did well during a 2-week work training program at a pet store, stocking shelves (Id.). The claimant indicated he would not be looking for a job until he graduated high school (Id.). Mental status examination was largely unremarkable, as the claimant was alert, oriented, and cooperative, with appropriate dress, average grooming, normal speech and thoughts, and no difficulty staying focused (Id.). The claimant was quiet, polite, and reserved, and though he never initiated conversation, he often made eye contact as he responded to questions (Id.). Mental status examination revealed intact memory, attention, and concentration, as the claimant recalled five of five objects after five minutes, and recalled six digits forward and four backward on digit span (Id.). The claimant was able to calculate change, and he knew the current president, and Dr. Spindler estimated average range intelligence (Id.). Dr. Spindler diagnosed

the claimant with autism spectrum disorder, unspecified depressive disorder, and unspecified anxiety disorder (Id.).

In February 2020, the claimant was admitted to MercyHurst University, Autism Initiative Program (Exhibit 17E). The program was designed to assist students become independent, successful learners, and assists with obtaining skills to help transition students from MercyHurst to employment (Id.).

(ECF No. 11, PageID #: 100–03).

## C.      Opinion Evidence at Issue

### 1.      State Agency Reviewing Physicians

On May 23, 2019, state disability determination services psychological consultant Paul Tangeman, Ph.D., opined that Claimant was capable of 1-2 step tasks, that are simple and routine and not fast paced. (ECF No. 11, PageID #: 163–64). He stated that Claimant was moderately limited in his ability to sustain an ordinary routine without special supervision and his ability to interact appropriately with the public. (ECF No. 11, PageID #: 164). Specifically, he explained that Claimant is "capable of a static work environment where there are no fast paced production demands and [Claimant] can receive assistance/guidance as needed in order to complete tasks." (ECF No. 11, PageID #: 165). On August 28, 2019, state disability determination services psychological consultant David Dietz, Ph.D., gave the same opinion. (ECF No. 11, PageID #: 180–81).

The ALJ found these opinions only partially persuasive. (ECF No. 11, PageID #: 107).

He explained:

In so finding, the undersigned notes the opinions are only partially supported by the evidence of autism spectrum disorder and anxiety disorder, with mild anxiety, moderate mood, and reserved demeanor, but otherwise normal mental status findings, including polite, cooperative behavior, intact eye contact, normal speech and thoughts, and adequate insight and judgment on examinations cited therein (Exhibit 1A/8-9; 3A/6-7). These largely unremarkable

mental status examination findings contradict the need for assistance/guidance contained in the opinions as noted above. Furthermore, the opinions are not entirely consistent with the remaining evidence of record, including subsequently submitted primary care treatment notes, which contain reports of increased anxiety with situational stressors, resulting in a prescription dosage increase and a referral to psychiatry, but consistently normal mental status findings, including appropriate mood and affect, normal speech/language, and thoughts, and appropriate insight and judgment on examination (Exhibit 19F). This evidence likewise confirms that a need for assistance/guidance as determined by Dr. Tangeman and Dr. Dietz is not warranted.

(ECF No. 11, PageID #: 107).

## 2. Consultative Examiner — James N. Spindler, M.S.

On May 9, 2019, Consultative examiner, James Spindler, M.S., examined Claimant and completed a psychological evaluation. (ECF No. 11, PageID #: 403). Mr. Spindler noted that Claimant had no apparent difficulty staying focused and provided coherent and relevant answers to questions. (ECF No. 11, PageID #: 405). He opined that Claimant's "autism spectrum disorder, lack of self-confidence and his distractibility, at least initially, will make it difficult for [Claimant] to maintain and to sustain a working pace and maintain a level of attention and concentration that would be adequate for most job settings." (ECF No. 11, PageID #: 408). He also stated, "it is likely to take [Claimant] longer than most people to feel reasonably comfortable with a new set of relationships." (ECF No. 11, PageID #: 408). Mr. Spindler suggested that Claimant "appears to be handling the current stressors in his life only moderately well" and "it seems likely that [Claimant] will, at least initially, find it difficult to handle the stressors of competitive employment." (ECF No. 11, PageID #: 409).

The ALJ found this opinion partially persuasive, reasoning:

First, it is noteworthy that the opinion is rather vague, without specifically defined functional limitations (Id.). Second, the opinion is not entirely supported by Dr. Spindler's largely unremarkable

examination of the claimant, during which the claimant was reserved, quiet, and never initiated conversation, but was alert, oriented, cooperative, and polite, with appropriate dress, adequate grooming, intact eye contact, normal speech and thoughts, intact focus, attention, concentration, and memory, and estimated average range intelligence (Id.). In addition, the opinion is only partially consistent with the remaining evidence of record, which confirms autism spectrum disorder, depressive disorder, and anxiety disorder, with mild to moderate anxiety, a disheveled appearance, an occasionally depressed, irritable mood, consistently abnormal affect, occasionally pressured speech, and frequently impaired insight and judgment, but normal alertness, at times good grooming, otherwise normal speech, consistently normal thoughts, intact associations, an otherwise euthymic mood, and good fund of knowledge on examinations (Exhibit 5F, 12F, 15F, 16F, 19F).

(ECF No. 11, PageID #: 108).

## IV.    The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

2. The claimant has the following severe impairments: asthma, disorder of thyroid gland, dermatitis, obesity, autism spectrum disorder, depressive disorder, and anxiety disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), except frequently climb ramps or stairs; occasionally climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, or crawl; must avoid concentrated exposure to extreme heat, extreme cold, and fumes, odors, dust, gases, or poor ventilation; cannot work in a loud or very loud environment; must avoid all exposure to hazards such as unprotected heights, moving machinery, and commercial driving; can understand, remember, and carry out simple instructions in a routine work setting; can respond appropriately to supervisors, coworkers, and work situations if the tasks performed are goal-oriented, but not at a production rate pace, and the work does not require more than superficial interaction,

meaning that it does not require negotiating with, instructing, persuading, or directing the work of others.

(ECF No. 11, PageID #: 93, 96).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that

impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404,

Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light

of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age,

education, and work experience, she can perform other work found in the national economy. 20

C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir.

2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she

is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has

the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529

(6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the

claimant has the residual functional capacity to perform available work in the national economy.

*Id.*

### C.        Discussion

Claimant raises two issues on appeal. First, Claimant argues that the psychological opinion

evidence does not support the ALJ's RFC determination. Although couched as a substantial

evidence argument, Claimant really appears to argue that the ALJ did not properly evaluate the

medical opinions of the state agency reviewing psychologists and the consultative examiner.

Second, Claimant argues that the medical evidence does not support the ALJ's RFC determination.

### 1.        The ALJ Did not Err in Evaluating the Medical Opinions

Claimant argues that the ALJ erred in his analysis of the state agency reviewing

psychologists' and Mr. Spindler's—the consultative examiner—opinions. At Step Four, the ALJ

must determine a claimant's RFC by considering all relevant medical and other evidence. 20

C.F.R. §§ 404.1520(e). The regulations provide that the Social Security Administration "will not

defer or give any specific evidentiary weight, including controlling weight, to any medical

opinion(s) or prior administrative medical finding(s)." C.F.R. § 404.1520c(a). Nevertheless, an ALJ must "articulate how [she] considered the medical opinions and prior administrative medical findings" in adjudicating a claim. 20 C.F.R. § 404.1520c(a). Medical source opinions are evaluated using the factors listed in 20 C.F.R. § 404.1520c(c). The factors include: supportability; consistency; the source's relationship with the claimant; the source's specialized area of practice, if any; and "other factors that tend to support or contradict a medical opinion." 20 C.F.R. §§ 404.1520c(c), 404. 1520c(b)(2). In doing so, the ALJ is required to explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). ("The factors of supportability [] and consistency [] are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions . . . .").

Claimant asserts that the ALJ "simply failed to consider the consistency of the opinions of the psychologists with one another and with other evidence of record." (ECF No. 12 at 20). Instead, Claimant states that the ALJ "essentially cites to the same mental status findings used to evaluate supportability." (ECF No. 12 at 20). Although Claimant makes the same argument for both opinions, the Court will consider the ALJ's evaluation of the state agency psychologists' opinions and Mr. Spindler's opinion separately for clarity.

### a.    The State Agency Reviewing Psychologists' Opinions

In relevant part, the state agency reviewing psychologists opined that Claimant is "capable of a static work environment where there are no fast paced production demands and [Claimant] can receive assistance/guidance as needed in order to complete tasks." (ECF No. 11, PageID #: 165). Had the ALJ adopted the assistance/guidance limitation, the vocational expert stated there would not be any jobs Claimant could perform. However, the ALJ rejected this part of the opinion,

reasoning that the "largely unremarkable mental status examination findings contradict the need for assistance/guidance contained in the opinions." (ECF No. 11, PageID #: 107). Moreover, the ALJ explained that the state agency psychologists opinions' "are not entirely consistent with the remaining evidence of record," which included, "subsequently submitted primary care treatment notes, which contain reports of increased anxiety with situational stressors, resulting in a prescription dosage increase and a referral to psychiatry, but consistently normal mental status findings, including appropriate mood and affect, normal speech/language, and thoughts, and appropriate insight and judgment on examination." (ECF No. 11, PageID #: 107).

Claimant argues that the ALJ based his opinion on the fact that the status examinations were "largely unremarkable" but failed to consider the consistency of the opinions with each other and the evidence of record, both medical and non-medical. The Commissioner responds stating that the ALJ specifically addressed consistency, citing primary care notes showing normal mental status findings. Claimant replies, however, that normal mental status findings "say[] little about his autism spectrum disorder or his ability to sustain the mental demands of work on a regular and continuing basis." (ECF No. 16 at 5). The Court disagrees.

First, the ALJ met the articulation requirements of 20 C.F.R. § 404.152c. The ALJ explained that the opinions were only partially supported by the evidence and inconsistent with subsequently submitted primary care treatment notes. Claimant, however, argues that the ALJ failed to meet the requirements because the ALJ did not analyze the consistency of the opinions to one another and the other evidence of record. Claimant misunderstands the articulation requirement. There is no requirement that the ALJ articulate whether the opinion was consistent with each and every piece of evidence in the record. Instead, the ALJ simply must explain how he analyzed the consistency of the opinion. *See* 20 C.F.R. § 416.920c(b)(2) ("[W]e will explain how

we considered the supportability and consistency factors for a medical source's medical opinions . . . ."). "The more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be. 20 C.F.R. 404.1520c(c)(2). The fact that the ALJ found the opinions inconsistent with the treatment notes—a part of the record—was reason enough to find the opinions less persuasive. The ALJ, thus, explained the supportability and consistency of the opinions and built a logical bridge for the Court to understand his decision.

Second, the ALJ's evaluation was supported by substantial evidence. The state reviewing psychologists' opinions were based on the medical record. However, the ALJ stated that part of the record they relied on—the examinations—did not support their conclusions. The ALJ specifically cited findings of cooperation, no difficulty staying focused, and functioning in the average range of intelligence. The Court concludes that these findings provide substantial evidence for the ALJ's supportability determination. Additionally, the ALJ concluded that largely unremarkable mental status examination findings were inconsistent with an assistance/guidance limitation and the opinions in general were not consistent with subsequent treatment notes. The ALJ also explained elsewhere in the opinion why he concluded Claimant did not require additional mental limitations. *See Moscorelli v. Colvin*, No. 1:15-CV-1509, 2016 WL 4486851, at *4 (N.D. Ohio Aug. 26, 2016) ("[I]t is only necessary that the ALJ's explanation, in the context of the decision as a whole, afford an opportunity for meaningful review . . . ." (citations omitted)). He stated that that Claimant "has been alert, oriented, polite, and cooperative, with appropriate dress, otherwise average grooming, intact eye contact, generally normal speech, consistently normal language and thoughts, intact associations, focus, and memory, normal attention and concentration, good fund of knowledge, and average range intelligence on examination and testing

(Exhibit 13E, 14E, 1F, 5F, 6F, 7F, 8F, 9F, 12F, 15F, 16F, 18F, 19F)." (ECF No. 11, PageID #: 105). The fact that Claimant has generally normal thoughts, intact associations, focus, and memory, normal attention and concertation, a good fund of knowledge, and average range intelligence all support the ALJ's conclusion that Claimant did not require an assistance/guidance limitation. Despite Claimant's objection, the ALJ did not error by discussing the examination findings when explaining both the supportability and consistency conclusions because the state reviewing psychologists were basing their opinion solely on the medical record and consistency requires discussing the medical record—so the two discussions necessarily had to overlap.

Nonetheless, Claimant argues that the evidence the ALJ used to support his findings does not contradict the state reviewing psychologists' opinion that Claimant needed an assistance/guidance limitation. The Court first notes that, as discussed above, the ALJ's conclusions were supported by substantial evidence. Moreover, "[e]ven when an ALJ finds a medical source's opinion persuasive or consistent and well-supported,"—which the ALJ did not in this case—"'there is no requirement that an ALJ adopt [a medical source's] limitations wholesale.'" *Bryson v. Comm'r of Soc. Sec.*, No. 1:20-cv-1137, 2021 WL 2735993, at *16 (N.D. Ohio June 10, 2021) (alterations in original) (citing *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 175 (6th Cir. 2015)). The ALJ was therefore under no obligation to adopt the state agency reviewing psychologists' assistance/guidance limitations.[3] Thus, the Court concludes that the ALJ

---

[3] Claimant also spends a large part of his briefs arguing that by relying on "some" normal mental status findings to reject parts of the psychologists' opinions, the ALJ substituted his opinion for that of the physicians. (ECF No. 12 at 21–22); (ECF No. 16 at 5–8). This is an incorrect understanding of the ALJ's role. The ALJ is not required to defer to a medical source's opinion. 20 C.F.R. § 416.920c(a). Instead, the ALJ is to consider the opinion and determine its persuasiveness based on several factors. *Id.* The ALJ is free to reject a medical opinion if he determines that the opinion is inconsistent with examination findings or not supported by them—which is what happened here. *Id.* § 416.920c(c)(3). Thus, the Court finds no error.

did not err in his analysis of the state agency reviewing psychologists' opinions.

### b.    Mr. Spindler's Opinion

In relevant part, Mr. Spindler opined that it will be difficult for Claimant to maintain and sustain a working pace and level of attention and concentration that would be adequate for most jobs, and it will likely take longer for him to feel reasonably comfortable with a new set of relationships. He also suggested that Claimant handles the current stressors in his life "only moderately well" and Claimant will likely, at least initially, "find it difficult to handle the stressors of competitive employment." (ECF No. 11, PageID #: 408). The ALJ found this opinion partially persuasive. The ALJ first stated that the opinion was vague, failing to specifically define functional limitations. Then, the ALJ stated that it was not supported by Spindler's "largely unremarkable examination" of Claimant. The ALJ also stated that the opinion was only partially consistent with the medical record. The ALJ recognized that there was medical evidence of "autism spectrum disorder, depressive disorder, and anxiety disorder, with mild to moderate anxiety, a disheveled appearance, an occasionally depressed, irritable mood, consistently abnormal affect, occasionally pressured speech, and frequently impaired insight and judgment," but also noted that the evidence also showed "normal alertness, at times good grooming, otherwise normal speech, consistently normal thoughts, intact associations, an otherwise euthymic mood, and good fund of knowledge on examinations." (ECF No. 11, PageID #: 108).

Claimant again argues that the ALJ based his opinion on the fact that the status examinations were "largely unremarkable" but failed to consider the consistency of the opinions with each other and the evidence of record, both medical and non-medical. As discussed above, however, the ALJ was not required to articulate the opinion's consistency with each and every

piece of evidence. The ALJ must simply discuss supportability and consistency and support his findings with substantial evidence.

The Court finds that he satisfied both requirements. First, the ALJ met the articulation requirement. He stated that the opinion was not entirely supported by Mr. Spindler's largely unremarkable examination. Then he concluded that the opinion as only partially consistent with the remaining evidence of record—namely other examination findings. This is sufficient to satisfy 20 C.F.R. § 404.920c.

Second, both statements are supported by substantial evidence. Mr. Spindler stated that Claimant would initially have trouble maintaining a working pace and level of attention and concentration required for work. He opined that Claimant would need a significant adjustment period before functioning at his full capacity. However, in his evaluation notes, Mr. Spindler specifically observed that Claimant "had no apparent difficulty staying focused during the evaluation, though comments in the Function Report, which may have been completed by his mother, state that he is easily distracted." (ECF No. 11, PageID #: 405). Mr. Spindler stated that Claimant did not ramble and provided coherent and relevant answers to questions. (ECF No. 11, PageID #: 405). He also noted that Claimant's thought associations were adequate, with no fragmentation of thought and stated that Claimant's judgment was reliable for most routine matters. (ECF No. 11, PageID #: 405–06). These findings provide substantial evidence for the ALJ's conclusion that Mr. Spindler's opinion was not supported by his own examination findings. Similarly, medical findings throughout the record provide support for the ALJ's conclusion that Mr. Spindler's opinion was inconsistent with the medical record. Findings of normal alertness, good grooming, normal speech and thoughts, intact associations, and a good fund of knowledge provide substantial evidence to support the ALJ's determination. Accordingly, the Court concludes

that the ALJ met the articulation requirements and supported his conclusions with substantial evidence.

## 2. The ALJ's RFC determination is Supported by Substantial Evidence

Claimant's second assignment of error asserts that the ALJ's "analysis is not saved by other evidence, namely the evidence from Opportunities for Ohioans with Disabilities." (ECF No. 12, PageID #: 843). Claimant's assertion essentially argues two things: (1) the evidence from Opportunities for Ohioans with Disabilities ("OOD") does not support the ALJ's RFC determination and its lack of additional mental limitations; and (2) the ALJ failed to discuss the assessment that Claimant's job coach from ODD gave.

Claimant's first assignment of error is essentially a cherry-picking argument. *See* ECF No. 12, PageID #: 844–45 ("An administrative law judge cannot simply 'pick and choose' evidence in the record 'relying on some and ignoring others, without offering some rationale for his decision.'" (citations omitted)). "The problem with a cherry-picking argument is that it runs both ways. [Claimant] argues the ALJ only focused on the positives, whereas his brief emphasizes the negatives. Crediting [Claimant's] argument here would require the Court to re-weigh evidence — which it cannot do." *Colvin v. Comm'r of Soc. Sec.*, No. 5:18 CV 1249, 2019 WL 3741020, at *14 (N.D. Ohio May 8, 2019). Instead, to be successful, a claimant must show that the ALJ's decision is not supported by substantial evidence. "[A] claimant does not establish a lack of substantial evidence by pointing to evidence of record that supports her position. Rather, [the claimant] must demonstrate that there is not sufficient evidence in the record that would allow a reasoning mind to accept the ALJ's conclusion." *Greene v. Astrue*, No. 1:10-cv-0414, 2010 WL 5021033, at *4 (N.D. Ohio Dec. 3, 2010). The Court determines, however, that despite the evidence Claimant showcases, the ALJ's decision is supported by substantial evidence.

As discussed above, the ALJ relied on generally normal examination findings to support his decision that Claimant did not require additional mental limitations. This is substantial evidence to support his RFC determination. Moreover, the Court notes that additional evidence supports the ALJ's conclusions. *See White v. Comm'r of Soc. Sec.*, No. 10-cv-14365, 2011 U.S. Dist. LEXIS 126377, at *6 (E.D. Mich. July 19, 2011) ("When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole . . . ." (citations omitted)). As the ALJ noted when discussing Claimant's subjective impairments, Claimant received only mild academic support in school which resulted in significant progress, Claimant has received stabilization with conservative behavioral health treatment, and Claimant has done well academically. In fact, reports from the classroom indicate that Claimant participates appropriately in class and was easily redirected. There is more than enough evidence to support the ALJ's RFC and the lack of additional limitations. Claimant's first argument is, therefore, without merit.

Claimant's second argument is similarly meritless. Claimant suggests that the ALJ erred by failing to mention Claimant's job coach's assessment. After Claimant's completion of a summer youth work experience with OOD, Claimant's job coach filled out an assessment indicating that Claimant met five of eight transitional youth benchmarks. However, Claimant did not, according to the job coach, demonstrate the ability to: (1) perform work tasks with decreasing level of support at or near competitive level, retain instructions, follow workplace rules, be aware of safety issues, etc.; (2) perform work tasks without support; and (3) perform competitive and integrative employment. (ECF No. 11, PageID #: 780). When discussing the evidence, the ALJ stated that Claimant "engaged in work activity by way of receipt of vocational rehabilitation services, which included the tasks such as stocking and cleaning. The claimant was able to perform

tasks correctly/to expectation after prompting and redirection to stay on task" (ECF No. 12, PageID #: 102–03) but did not discuss the job coach's assessment.

Claimant argues that it was error for the ALJ to "completely ignore[] the conclusions." (ECF No. 12, PageID #: 108). This is incorrect, however, as an ALJ is not required to articulate how he considers evidence from a nonmedical source. 20 C.F.R. § 404.1520c. Claimant's job coach is a nonmedical source. The ALJ was therefore not required to articulate how he considered the job coach's assessment. To the extent Claimant argues the ALJ did not properly discuss the evidence from OOD other than the job coach's assessment, the Court notes that an "ALJ need not cite every piece of evidence in the record and 'an ALJ's failure to cite specific evidence does not indicate that it was not considered.'" *Deaner v. Comm'r of Soc. Sec.*, 840 F. App'x 813, 819 (6th Cir. 2020) (citations omitted). Accordingly, the Court finds no reason to disturb the ALJ's conclusions.

## VI.     Recommendation

Based on the foregoing, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

 Dated: November 30, 2021

> s/ *Carmen E. Henderson*
> CARMEN E. HENDERSON
> U.S. MAGISTRATE JUDGE

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F. 3d 520, 530–31 (6th Cir. 2019).